(C. D. 1585)

INTRA-MAR TRANSPORT CORPORATION, FORMERLY GONDRAND TRANS-
PORT CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 4, 1954)

*Brooks & Brooks* (*Frederick W. Brooks* and *Thomas J. McKenna* of counsel) for the petitioner.

*Warren E. Burger*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the respondent.

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: This is a petition by Intra-Mar Transport Corporation, formerly Gondrand Transport Corporation, filed under authority of section 489, Tariff Act of 1930, for the remission of additional duties accruing by reason of the undervaluation of two importations of hard candy imported from Cuba at the port of New Orleans on December 16, 1946. One importation, entry No. 973, covered 2,500 cartons, containing 45,000 pounds, and the other, entry No. 974, covered 1,500 cartons, containing 27,000 pounds. The merchandise was originally entered at 11 cents per pound and was thereafter, on November 12, 1947, amended to 15 cents per pound. It was appraised on January 9, 1948, at $8 per carton, net, packed, less the cost of American containers at $1.44 per carton, and less nondutiable charges, sugar tax, and duty.

Entry was made in the name of Gondrand Transport Corp. (hereinafter called Gondrand)[1] for the account of Jose M. Arago, by W. R. Zanes & Co., Inc. (hereinafter called Zanes), customs broker. The consular invoices state that the seller or consignor is Central "San Ramon," S. A., and the purchaser or consignee is Jose M. Arago. The purchase price is given as 11 cents per pound.

At the trial, Estey Baxter, president of Zanes, testified that his firm was asked by Gondrand to prepare the entries herein and secure the release of the merchandise. For this purpose, he received the consular invoices and the ocean bills of lading. He asked Gondrand to secure the signature of Jose M. Arago, the importer, on the submission sheet and to obtain from him information as to subsequent orders and subsequent quotations so that the form could be completely filled out. The reason for this, Mr. Baxter explained, was that it was not the practice of the appraiser at New Orleans to give any information as to value, unless the submission sheet was completed and signed by the importer. It appears that this was not done, and no submission sheet was ever filed in this case. Mr. Baxter said, however, that although he could not give the appraiser the information he wanted, he gave him everything he had.

Mr. Baxter testified that the only information as to value which he had at the time of making entry was that found on the consular invoices. He made no inquiries about the merchandise of anyone other than Gondrand, a freight forwarding company. He did not communicate with the shipper.

---

[1] It appears from the record that Gondrand Transport Corporation (or Gondrand Transport Corp.) was a part of Gondrand Shipping Corp. and that Intra-Mar Transport Corporation had by the time of the trial taken over the business of the Gondrand companies. Both Gondrand companies are hereinafter referred to as Gondrand.

William Bos, a customs broker in the employ of Intra-Mar Transport Corporation (formerly Gondrand), testified that the business of the firm was customs brokerage and forwarding and that it had an office in Havana. He was familiar with the shipments involved herein and had instructed Zanes to enter the merchandise at New Orleans. He was shown the commercial invoices and translations thereof and stated that the translations were correct except that the word "exactos" is generally taken to mean "true and correct." These documents, the originals of which were signed by the director general of Central "San Ramon," S. A., were received in evidence as petitioner's collective exhibits 2 and 3. They give the price of the candy as 11 cents per pound, and, as translated by Mr. Bos, each states that "The details that figure in this invoice are true and correct."

Mr. Bos testified that at the time of entry he had no information as to the value of this merchandise except that contained in the consular and commercial invoices. He did not know of anyone to whom to go for information except Mr. Arago who was unavailable and could not be located. Mr. Bos, therefore, telephoned to his firm's Havana office and told it to get the information necessary to fill out the submission sheet. Some time later, said firm gave him information to the effect that 15 cents per pound was considered the actual value of the merchandise, and the entries were amended to that figure.

David S. Sullivan, formerly connected with Gondrand as manager of the New Orleans office, testified that as he was not qualified as a customs broker, he turned over customs entries to Zanes. In the instant case, he passed the consular and commercial invoices to that firm and when he was told that said firm was unable to obtain sufficient information to complete the submission sheet, he authorized it to make entry at the invoice price. He made no inquiry or investigation to ascertain the value prior to making entry. After entry, he called the Havana office to get information as to the value of the merchandise, but said firm was unable to give him any. It did advise him that Mr. Arago was a wealthy man, had a good reputation in Havana, and would pay any bills without question.

Subsequently, Mr. Sullivan was visited by Mr. McLendon, special customs agent, to whom he turned over his file. According to Mr. Sullivan, Mr. McLendon asked whether he had sufficient funds on deposit in Havana and stated, "It looks to me like you are going to have some trouble."

Mr. Sullivan stated that he had instructions from Mr. Arago to ship the candy to Camp-Bordelon Wholesale Candy Co. (hereinafter called Camp-Bordelon) at Houston, Tex., but at the beginning he did not ask said firm the price it paid for the merchandise. After Mr. McLendon's visit, he tried to get information from it but was unsuccessful. According to Mr. Sullivan, "they said that Arago was

the man who sold it to them and they didn't know where I came into it."

Respondent called Charles J. Colomer, Jr., customs examiner at the port of New Orleans, who testified that he had had the within merchandise under his observation and supervision for examination. Prior to entry, no one offered him a submission sheet or consulted him about the value of the merchandise. Subsequently, he thought Mr. Sullivan visited the office and asked about the contemplated appraised values.

Mr. Colomer testified that a submission sheet signed by a representative of the importer or by a customs broker was acceptable at New Orleans, but that it had to be completely filled in.

Thomas McLendon, called as a witness for respondent, testified that he was a customs agent at New Orleans and, in that capacity, had made an investigation of the transactions involved herein. He first talked with Mr. Sullivan on January 14, 1947, at which time Mr. Sullivan made his files available and stated that he had met Mr. Arago recently and that the latter "told him that he owned the Central San Ramon, which made most of the candies involved in this case." On June 3, 1947, Mr. McLendon visited Mr. Sullivan again to see if he had any further information as to the value of the candy. Mr. Sullivan stated that his office had received a substantial deposit from Mr. Arago to cover any additional duties that might result and showed him a shipping document indicating that the candy had been forwarded to Camp-Bordelon in Houston.

Alvin Scharff, customs agent in charge at Houston, Tex., testified at some length about an investigation he had made in connection with Cuban hard candies shipped to Mr. Arago. He said that his inquiry covered the entire transaction, including the particular entries involved herein. From his testimony, it appears that Mr. Arago had made a contract in his own name with Camp-Bordelon to furnish it with one million pounds of hard candy, some to be produced by his firm, Central "San Ramon," S. A., and some by the Cuban Candy Co.; that he had shipped 700,000 or 800,000 pounds in fulfillment of the contract; and that some of the candy was entered at New Orleans, La., some at Houston, Tex., and some in Florida.

Mr. Scharff testified that he interrogated Mr. Arago under oath on January 29, 1947, at which time Mr. Arago stated that he had contracted to sell the candy at 11 cents per pound. At a second interview, on April 21, 1947, Mr. Arago stated, however, that he had been confused before and that his agreement with Camp-Bordelon had been for the sale of one million pounds of bulk hard candy at $0.225 per pound c. i. f. duty paid, Houston, Tex., and that for each 100,000 pounds of bulk candy, Camp-Bordelon agreed to purchase 500 cartons of hard candy in glass jars at $5 per carton, c. i. f. duty paid, Houston, Tex.

Mr. Scharff also visited the office of Camp-Bordelon and obtained a copy of the so-called contract for the purchase of this candy. This document, received in evidence as defendant's exhibit A, is actually a request by Camp-Bordelon to the First National Bank of Boston to issue a letter of credit in favor of Mr. Arago, but it includes the following statement:

This credit is to cover shipment of Hard Candy in glass jars, packed in cartons, net weight of candy to be 18 lbs. per carton, at $8.00 per carton, and Candy Drops packed in cartons, each containing 4 packages of 10 lbs. each, at $9.00 per carton, both prices C. I. F. Houston, Texas, to be shipped from Havana to Houston, Texas. Partial shipments are permitted.

According to Mr. Scharff, Mr. Bordelon stated that Mr. Arago had offered by telephone to sell a million pounds of candy at 22½ cents per pound f. o. b. Houston and New Orleans, which offer he (Mr. Bordelon) had accepted later in Havana. Because of a delay in shipment, he visited Havana again at which time the above-mentioned request for a letter of credit was made.

On the above record, petitioner claims that it has established that it made a full disclosure of all facts in its possession relating to value and that, by attempting to communicate with Mr. Arago, by requesting information from the manufacturer, and by delivering its file to the investigating agent, it has shown its entire good faith and diligence throughout this transaction and is, therefore, entitled to a remission of the additional duties assessed for undervaluation of the merchandise.

In cases of this kind, the question is not whether the record affirmatively shows that the petitioner entered its goods in bad faith, but whether it has met its burden of proving that in making the entries it exercised such good faith as is required by the statute. *Kachurin Drug Co.* v. *United States*, 26 C. C. P. A. (Customs) 356, C. A. D. 41. An indifference to the proper value of the merchandise does not meet the requirements of the statute; the entrant owes a duty to inform itself as to the correctness of its representations of the value of the merchandise. *R. W. Gresham* v. *United States*, 27 C. C. P. A. (Customs) 106, C. A. D. 70.

It has been held that when a submission sheet is returned with no information, that fact is sufficient to put a broker on notice so as to require him to seek further information as to value. *United States* v. *Aug. F. Stauff & Co.*, 25 C. C. P. A. (Customs) 215, T. D. 49306; *United States* v. *Edward H. Corrigan*, 38 C. C. P. A. (Customs) 26, C. A. D. 434. Where, as in the instant case, the broker does not have sufficient information to fill out a submission sheet, he is certainly required to make a further investigation as to the value of the merchandise.

The requirements of the statute are not met where the petitioner makes no inquiry of the seller, or of the purchaser, or of the ultimate consignee, or of others in the trade. *United States* v. *Edward H. Corrigan, supra; United States* v. *H. S. Dorf of Pa., Inc.,* 36 C. C. P. A. (Customs) 29, C. A. D. 392; *United States* v. *Pacific Customs Brokerage Company,* 41 C. C. P. A. (Customs) 4, C. A. D. 521.

In the instant case, Mr. Bos testified that Mr. Arago, the importer and purchaser of record, was unavailable; that he was in Houston or some other place and could not be located. However, Mr. Bos did not state what efforts were made to contact him. Since Mr. Scharff interviewed Mr. Arago in Houston a little over a month after the date of entry herein, it is apparent that the mere statement that he was unavailable does not establish that due diligence was exercised in attempting to locate him or to get information from him. According to Mr. McLendon, Mr. Sullivan stated in January 1947 that he had recently met Mr. Arago. Apparently, Mr. Sullivan did not ask him anything about the value of the candy at that time.

There is evidence that Gondrand's Havana office was asked to contact the shipper, Central "San Ramon," S. A., but there is no direct evidence as to what was done to ascertain from it the value of the merchandise. It appears, in fact, that Gondrand was more interested in establishing Mr. Arago's financial responsibility than the value of the merchandise. Finally, after a visit by Customs Agent McLendon, which definitely put Gondrand on notice that the value of the merchandise was being questioned, an inquiry was made of Camp-Bordelon, the ultimate purchaser. However, it was apparently made in such a way that Camp-Bordelon saw no reason to answer it.

We do not think that these perfunctory actions by Gondrand constitute the reasonable inquiry as to the value of the merchandise which is required where, as here, there are circumstances which would put a reasonably prudent person on notice that it was his duty to seek further information. *Finsilver, Still & Moss* v. *United States,* 13 Ct. Cust. Appls. 332, T. D. 41250.

In the instant case, Zanes, the broker, was acting for Gondrand, and Gondrand was acting for Mr. Arago. Mr. Arago was not only the importer and purchaser of record, he was also an officer and part owner of Central "San Ramon," S. A., the shipper, and was the seller of the merchandise to Camp-Bordelon. Certainly, he must have known the correct value of the merchandise, but there is no evidence that he gave such information to Gondrand nor that Gondrand or Zanes made any serious attempt to get it from him. There is nothing in the record which excuses the entry of the merchandise at the wrong value when the correct value was known by the principal for whom the agents were acting. *United States* v. *Pacific Customs Brokerage Company, supra,*

For the reasons stated, the petition is denied, and judgment will be entered for the respondent.